**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| ROBERT SAMUELS and ERIC RAVOTTI, individually and on behalf of all others similarly situated, | Case No.: 16-cv-05270 |
| | Hon. Jorge L. Alonso |
| *Plaintiffs*, | |
| *v.* | |
| THE PENNSYLVANIA STATE UNIVERSITY, BIG TEN CONFERENCE, and THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| *Defendants.* | |

## FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Robert Samuels and Eric Ravotti bring this First Amended Class Action Complaint and Demand for Jury Trial against Defendants The Pennsylvania State University ("Penn State"), Big Ten Conference ("Big Ten"), and the National Collegiate Athletic Association ("NCAA") to obtain redress for all persons injured by their reckless disregard for the health and safety of generations of Penn State student athletes. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

### INTRODUCTION

1.      Nearly one hundred thousand student-athletes sign up to compete in college football each year and it's no surprise why. Football is America's sport and Plaintiffs and a Class of football players (defined below) were raised to live and breathe the game. During football season, there are entire days of the week that millions of Americans dedicate to watching these kids play. On game days, tens of thousands of fans fill stadium seats and even more watch

around the world. Before each game, these players—often 18 year old freshmen in college—are riled up and told to do whatever it takes to win and, when playing, are motivated to do whatever it takes to keep going.

2.      But up until 2010, Defendants Penn State, Big Ten, and the NCAA kept their players and the public in the dark about an epidemic that was slowly killing their athletes.

3.      During the course of a college football season, athletes can receive more than 1,000 impacts greater than 10g's (gravitational force) and, worse yet, the majority of football-related hits to the head exceed 20g's. To put this in perspective, if you drove you car into a wall at twenty-five miles per hour and you weren't wearing a seatbelt, the force of you hitting the windshield would be around 100g's. That means each season these 18, 19, and 20 year old student-athletes are being subjected to the equivalent of several hundred car accidents per season.

4.      Overtime, the repetitive and violent impacts to players' heads led to repeated concussions that severely increased their risks of long term brain injuries, including memory loss, dementia, depression, Chronic Traumatic Encephalopathy ("CTE"), Parkinson's disease, and other related symptoms. Meaning, long after they played their last game, they are left with a series of neurological events that could slowly strangle and choke their brains.

5.      Unfortunately, for decades, Defendants Penn State, Big Ten, and the NCAA knew about the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries (referred to as "traumatic brain injuries" or "TBIs") that resulted from playing college football, but actively concealed this information to protect the very profitable business of "amateur" college football.

6.      While in school, Penn State football players were under Defendants Penn State's, Big Ten's, and the NCAA's care. But, unfortunately, Defendants did not care about the off-field

consequences that would haunt their students for the rest of their lives.

7.      Despite knowing for decades of a vast body of scientific research describing the danger of TBIs, Defendants failed to implement procedures to protect Plaintiffs and other Penn State football players from the long-term dangers associated with them. They did so knowingly and for profit.

8.      As a direct result of Defendants' actions (or lack thereof), Plaintiffs and a Class of former Penn State players (defined below) now suffer from neurological and cognitive damage, including symptoms of traumatic encephalopathy.

## PARTIES

9.      Plaintiff Robert Samuels is a natural person and citizen of the State of Florida.

10.      Plaintiff Eric Ravotti is a natural person and citizen of the Commonwealth of Pennsylvania.

11.      Defendant The Pennsylvania State University is a university located at 201 Old Main, University Park, Pennsylvania 16802. Defendant Penn State conducts business throughout this District, the State of Illinois, and the United States.

12.      Defendant Big Ten Conference is a collegiate athletic conference with its principal office located 5440 Park Place, Rosemont, Illinois 60018 and with member institutions in over fourteen states, including Illinois. Defendant Big Ten conducts business throughout this District, the State of Illinois, and the United States.

13.      Defendant NCAA is an unincorporated association with its principal office located at 700 West Washington Street, Indianapolis, Indiana 46206. Defendant NCAA conducts business throughout this District, the State of Illinois and the United States.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this case under 28 U.S.C. §

1332(d)(2) because (a) at least one member of the Class, which consists of at least 100 members,

is a citizen of a state different from Defendants, (b) the amount in controversy exceeds

$5,000,000, exclusive of interest and costs, and (c) none of exceptions under that subsection

apply to this action.

15.     This Court has personal jurisdiction over Defendants because they conduct

significant business in this District, including establishing consumer and business contracts here,

and the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated

in part from this District.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants

conduct significant business in this District, including establishing consumer and business

contracts here. Venue is additionally proper because Defendant Big Ten resides here.

## FACTUAL BACKGROUND

**I.      The NCAA, Big Ten, and Penn State Had a Duty to Protect Their Student-Athletes.**

17.     Defendant NCAA is the governing body of collegiate athletics that oversees

twenty-three college sports and over 400,000 students who participate in intercollegiate athletics,

including in the Big Ten and the football program at Penn State. According to the NCAA,

"[m]ore than 1,200 schools, conferences, and affiliate organizations collectively invest in

improving the experiences of student-athletes – on the field, in the classroom, and in life."[1]

18.     To accommodate the wide spectrum of student-athletes at its member schools, the

---

[1]      Membership, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (May 17, 2016),
http://www.ncaa.org/about/who-we-are/membership.

NCAA has three different divisions of intercollegiate competition. Division I is the highest level of intercollegiate athletes sanctioned by the NCAA and includes many well-known schools, with high ranking teams, larger budgets, better facilities, and more athletics scholarships.

19.     Each NCAA Division is composed of several "conferences" to facilitate regional league play. Defendant Big Ten was established in 1896 to "organize and develop principles for the regulation of intercollegiate athletics."[2] In line with this mission statement, Big Ten promulgates rules, handbooks, and regulations for its member organizations in order to regulate its member institutions athletic departments. Each member institution, and each of the member institution's athletes, agree to abide by the rules and regulations issued by the NCAA and Big Ten.

20.     Penn State became a member of Big Ten in 1990, and made its first Big Ten football appearance in 1993.

21.     Penn State's football program has a strong following that attracts tens of thousands of visitors to its campus each game and generates tens of millions of dollars per year for the school. Given its significant following and numerous on-field successes, Penn State's football team attracts top talent from high schools around the country and has produced a number of professional players and Hall of Fame inductees.

22.     Collectively, Defendants govern and regulate the Penn State football program and owe a duty of care to safeguarding the well being of its student-athletes.

23.     In fact, since its founding in 1906, the NCAA (then the Intercollegiate Athletic Association of the United States ("IAAUS")), has claimed to be "dedicated to safeguarding the

---

[2]     Big Ten History, BIG TEN CONFERENCE (May 17, 2016), http://www.bigten.org/trads/big10-trads.html.

well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life."[3] The IAAUS was specifically formed for this purpose because, at the turn of the 20th Century, head injuries were occurring at an alarming rate in college football. In response, President Theodore Roosevelt convened a group of Ivy League university presidents and coaches to discuss how the game could be made safer. As a result of several subsequent meetings of colleges, the association was established.[4] As such, the genesis of the NCAA was for a singular goal: student-athlete safety.

24. According to the NCAA, "[c]ollege and university presidents and chancellors guide each division, supported by an extensive committee structure guided by athletic administrators, faculty and student-athlete representatives[, but that each] division creates its own rules that follow the overarching principles of the NCAA."[5]

25. The overarching principles of the NCAA, including its purported commitment to safeguarding its student-athletes, are contained in the NCAA Constitution. The NCAA Constitution clearly defines the NCAA's purpose and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and student-athletes. The NCAA Constitution states in pertinent part:

The purposes of this Association are:

(a) To initiate, stimulate and improve intercollegiate athletics programs for student athletes;

(b) To uphold the principal of *institutional control* of, and responsibility for, all intercollegiate sports in conformity with

---

[3] About the NCAA, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (May 17, 2016), http://www.ncaa.org/about.

[4] In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.

[5] Membership, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (May 17, 2016), http://www.ncaa.org/about/who-we-are/membership.

the constitution and bylaws of this association;

NCAA Const., Art. 1, § 1.2(a)(b).

26.     The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." NCAA Const., Art. 1, § 1.3.2.

27.     Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides:

**2.2. The Principle of Student-Athlete Well-Being**

Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes. (Revised: 11/21/05.)

**2.2.3 Health and Safety.**

It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes. (Adopted: 1/10/95.)

28.     To accomplish this purported purpose, NCAA promulgates and implements standard sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These NCAA documents provide detailed instructions on game and practice rules, player eligibility, scholarships, and player well-being and safety. NCAA member institutions, including athletic conferences like the Big Ten, are required to abide by the NCAA rules and requirements. Specifically, according to the NCAA Constitution: "Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs . . . Members of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with

7

the applicable Association rules, and the member institution shall be responsible for such compliance." NCAA Const., Art. 2, § 2.8.1

29.    The NCAA publishes a health and safety guide termed the Sports Medicine Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidelines, and recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation."[6]

30.    To provide member institutions with the tools that they need to comply with NCAA legislation, the NCAA Constitution promises that the "Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations. . . ." NCAA Const., Art. 2, § 2.8.2

31.    Likewise, according to the NCAA Constitution, a member conference is entitled to all of the privileges of active members, except the right to compete in NCAA championships. *See* NCAA Const., Art. 3, § 3.02.3.2. Member "conferences of [the NCAA] agree to administer their athletics programs in accordance with the constitution, bylaws and other legislation of the Association]." NCAA Const., Art. 3, § 3.3.4.

32.    The NCAA, therefore, holds itself out as both a proponent of and authority on the treatment and prevention of sports-related injuries upon which the student-athletes, Big Ten, and Penn State (*i.e.*, a member institution) can rely upon for guidance on player-safety issues.

33.    As a member conference, Big Ten is charged with implementing and enforcing

---

[6]    *See, e.g.*, David Klossner, *2013-14 NCAA Sports Medicine Handbook*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Aug. 2013), *available at* https://www.ncaa.org/sites/default/files/2013-14%20Sports%20Medicine%20Handbook.pdf.

those guidelines in a meaningful way to protect the health and safety of Penn State football players, including Plaintiffs.

34.     Likewise, as a member institution, Penn State is charged with implementing and enforcing those guidelines in a meaningful way to protect the health and safety of Penn State football players, including Plaintiffs.

35.     As members of the NCAA, Big Ten and Penn State were obligated to help protect the health and safety of its student-athletes and agreed to abide by the NCAA Constitution.

36.     As compared to Plaintiffs and other Penn State football players, Big Ten, Penn State, and NCAA were in superior positions to know of and mitigate the risks of concussions and other TBIs.

**II.     Decades of Studies Firmly Establish the Dangers Associated with Football-Related Concussions.**

37.     Throughout the twentieth century and into the twenty-first century, studies have firmly established that repetitive and violent impacts to the head can cause concussions with a heightened risk of long term traumatic brain injuries (or TBIs), including memory loss, dementia, depression, CTE, Alzheimer's disease, Parkinson's disease, and other related symptoms. To better understand the results of these studies, a brief introduction to concussions in football follows.

*A.     An Overview of Concussions in Football.*

38.     A concussion is a traumatic brain injury caused by an impact that causes the head and brain to move rapidly back and forth. The movement causes the brain to bounce around or twist in the skull, damaging brain cells and creating chemical changes in the brain.

39.     The human brain is made of soft tissue, cushioned by spinal fluid, and encased in a hard skull. During everyday activity, the spinal fluid protects the brain from crashing against

9

the skull. But relatively minor impacts—including not only direct blows to the head but also blows to the body and movements that cause the neck to whiplash—can move the brain enough to press through the spinal fluid, knock against the inside of the skull, and cause concussions.

40.     Concussions typically occur when linear and rotational accelerations impact the brain through either direct impacts to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown athletes can receive more than 1,000 impacts greater than 10g (or gravitational) force. This is slightly more force than a fighter pilot receives doing maximal maneuvers. The majority of football-related hits to the head exceed 20g's.

41.     Kevin Guskiewicz, of the University of North Carolina's Sports Concussion Research Program, compared the impacts sustained in a routine college football practice to crashing a car: "If you drove your car into a wall at twenty-five miles per hour and you weren't wearing your seat belt, the force of your head hitting the windshield would be around 100[g']s: in effect, the player [who sustained two hits above 80g's,] had two car accidents that morning."

        i.      Concussion Symptoms.

42.     When a student-athlete suffers a severe impact to the head, they may start experiencing concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;

- memory loss, such as trouble remembering things that happened right before and after the injury;

- nausea or vomiting;

- headaches;

- blurred vision and sensitivity to light;

- slurred speech or saying things that do not make sense;

- difficulty concentrating, thinking, or making decisions;

- difficulty with coordination or balance (such as being unable to catch a ball or other easy tasks);

- feeling anxious or irritable for no apparent reason; or

- feeling overly tired.

43.     A student-athlete may not recognize the signs or symptoms of a concussion, or, more likely, the effect of the concussion itself prevents him from recognizing them. Because of that, he may put himself at risk of further injury by returning to a game after a concussion. Brains that have not had time to properly heal from a concussion are particularly susceptible to further injury.

        ii.     <u>Post-Concussion Treatment</u>.

44.     After a concussion, the brain needs time to heal. Doctors generally prohibit individuals from returning to normal activities—certainly including contact sports—until all symptoms have subsided. They do so because, immediately after a concussion, the brain is particularly vulnerable to further injury.

45.     The length of the healing process varies from person to person and from concussion to concussion. Symptoms may even last for one or two weeks.

46.     Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months or sometimes even be permanent. Generally, people suffering from post-concussion syndrome are referred to specialists for additional medical help.

47.     Many people think of concussions as short-term, temporary injuries. But scientific research demonstrates that the effects of concussions are anything but temporary.

B.  *Studies Confirm the Dangers and Long-Term Effects of Concussions.*

48.     The two leading studies of the long-term effects of concussions were conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute. These studies showed the "devastating consequences" of repeated concussions, including that they lead to an increased risk of depression, dementia, and suicide. These studies have also demonstrated that repeated concussions trigger progressive degeneration of the brain tissue, including the build-up of an abnormal protein called tau.

49.     Between 2002 and 2007, Dr. Omalu, of the Brain Injury Research Institute, examined the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelcyyk, and Damien Nash. Waters and Nash killed themselves, Webster—homeless and cognitively impaired—died of heart failure, and Strzelcyyk died driving the wrong way down a highway at 90 miles per hour. Four of the five brains showed the telltale characteristic of CTE, which is a progressive degenerative disease of the brain found in people with a history of repetitive brain trauma.

50.     Dr. Cantu, of the Boston University Center for the Study of Traumatic Encephalopathy, has found evidence of CTE in 90 of 94 (96%) of autopsied brains of former NFL players. He has found CTE in 79% of all autopsied brains of former football players (who played at *any* level).

51.     Dr. Omalu now believes that more than 90% of former NFL players suffer from CTE.

52.     Unfortunately, studies like Drs. Cantu's and Omalu's—which establish the devastating dangers related to TBIs—date back to the early twentieth century. Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science has long recognized

12

the debilitating effects of concussions and other TBI, and found that that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

53.     For instance, in 1928, pathologist Dr. Harrison Martland published a study called "Punch Drunk" in the *Journal of the American Medical Association*, where he described the clinical spectrum of abnormalities found in nearly 50 percent of boxers who had been knocked out or who had suffered a considerable impact to the head. *See* Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

54.     Countless studies were later conducted on boxers suffering chronic neurological damage as a result of repeated head injuries and who were displaying signs of dementia and impairment of motor function. As incidents of chronic encephalopathy increased, they were often characterized as a "Parkinsonian" pattern of progressive decline.

55.     Nearly a decade after Dr. Martland's study, the American Football Coaches Association first published a report warning that players who suffer concussions should be removed from play. Then nearly twenty years after that, in 1952, an article published in the *New England Journal of Medicine* first recommended a three-strike rule for concussions in football, that recommended that players cease to play football permanently after receiving their third concussion.

56.     Starting in the late 1960's, the medical community began focusing on the effects of concussion-related injuries in football. In a 1967 study, Drs. Hughes and Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms (commonly known as "EEGs"). Shortly after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is re-injury to an already-concussed brain that triggers

swelling that the skull cannot accommodate.

57.     Study after study published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet* warned of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has potential dangerous long-term effects on brain function;

- encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;

- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the axons (brain cells) brainstem;

- with respect to head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

- immediate retrograde memory issues occur following concussions;

- head injury requires recovery time without risk of subjection to further injury;

- a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

58.     As a result of these, and countless other studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled.

59.     By 1991, Dr. Cantu, the American Academy of Neurology, and Colorado Medical

Society developed return-to-play criteria for football players suspected of sustained head injuries.

60.     Building upon that, a convention of neurological experts met in Prague in 2004 with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play symptomatic, and coined the phrase, "when in doubt, sit them out."

61.     Ultimately, while the NCAA, Big Ten, and Penn State knew for decades of the harmful effects of TBI on student-athletes, they ignored these facts and failed to institute any meaningful methods of warning and/or protecting the student-athletes, including the football players. For Defendants, the continued expansion and operation of college football was simply too profitable to put at risk.

**III.     The NCAA, Big Ten, and Penn State Breached Their Duties to Their Student-Athletes By Concealing the Dangers of Concussions and Refusing to Implement Reasonable Concussion Management Protocols.**

62.     For decades, the NCAA, Big Ten, and Penn State have been aware that severe head impacts can lead to long-term brain injury, including memory loss, dementia, depression, and CTE. Unfortunately, while the NCAA, Big Ten, and Penn State knew about the harmful and devastating effects of these sub-concussive and concussive injuries, they actively concealed these facts from student-athletes and the public.

63.     In fact, on information and belief, during every decade referenced above, the NCAA, Big Ten, and Penn State were advised by physicians and researchers of the severe risks associated with playing football, including the risks associated with TBI.

64.     Rather than inform their student-athletes of these risks or implement protocols to protect and safeguard them from TBI-related injuries (as, at least, the NCAA and Big Ten

15

promised to do through the NCAA Constitution, among other things), the NCAA, Big Ten, and

Penn State failed to adopt any of the internationally accepted guidelines regarding concussion

management and return to play protocols until 2010.

65.     Instead, and in complete disregard of the vast body of known scientific evidence

and the resources and authority possessed by NCAA, Big Ten, and Penn State, up until 2010,

Defendants orchestrated an approach to football practices and games that:

- ignored the medical risks to Plaintiffs and other Penn State
  football players;

- aggravated and enhanced the medical risks to Plaintiffs and
  other Penn State football players;

- failed to educate Plaintiffs and other Penn State football
  players of the link between TBIs in amateur football and
  chronic neurological damage, illnesses, and decline;

- failed to implement or enforce any system that would
  reasonably have mitigated, prevented, or addressed TBIs
  suffered by Plaintiffs and other Penn State football players;
  and

- failed to timely implement "return to play" guidelines for
  student-athletes who sustain concussions.

66.     Indeed, the NCAA didn't even acknowledge the dangers of concussions in its

Sports Medicine Handbook until 1994 when it added what it captioned "Guideline 2o":

"Concussions and Second Impact Syndrome." But rather than mandating a specific treatment

protocol for member institutions, Guideline 2o left concussion management and treatment to the

individual team's discretion.

67.     For example, while the 1998–99 version of Guideline 2o reported that

"[c]oncussion and the resulting potential complications, such as second-impact syndrome, are

potentially life-threatening situations that student-athletes may suffer as a result of their athletics

participation," it also stated that the NCAA "does not endorse any specific concussion grading scale or return-to-play criteria."

68.     In this way, Guideline 2o acted as a liability cover for the NCAA without any NCAA enforcement activity to actually protect student-athletes.

69.     As such, despite having actual knowledge of the dangers of concussions, the NCAA refused to implement, endorse, or even recommend specific concussion grading scale or return-to-play criteria.

70.     To make matters worse, Penn State completely ignored Guideline 2o and failed to adopt or implement any concussion safety measures or return to play guidelines whatsoever for decades. In fact, Penn State's football program had no formal concussion-related safety measures or protocols until 2010.

71.     Moreover, neither the NCAA nor the Big Ten enforced—and Penn State did not comply with—Guideline 2o's statement that: "A student athlete rendered unconscious for any period of time should not be permitted to return to the practice or game in which the head injury occurred. In addition, no student-athlete should be allowed to return to athletics activity while symptomatic."

72.     Ultimately, until 2010, Defendants failed to:

- implement guidelines or rules to prevent repeated concussions and failed to educate players about the increased risk of concussive and sub-concussive injury in football, particularly under circumstances when the helmet is used as a weapon when tackling, blocking, or running with the football;

- recommend or enforce return to play procedures or took any action to educate student athletes about the risks of repetitive head injuries;

- conduct a football program that proactively rewarded Plaintiffs and other Penn State football players for inflicting head injuries and compelling them to ignore concussion symptoms and continue to play football within moments of experiencing concussion symptoms. For instance, Penn State coaches

demanded that Penn State football players, including Plaintiffs, sustain head injuries and inflict head injuries on other players for the purpose of advancing the Penn State football program by winning games, obtaining fame and favorable publicity, and gaining millions of dollars in revenue for Penn State, Big Ten, and NCAA; and

- contact Plaintiffs and other Penn State football players after they left Penn State to inform them that had been exposed to an increased risk of long-term brain damage by the concussive and sub-concussive blows sustained while playing football for Penn State.

73. It was also not until April 2010, under mounting public pressure, that the NCAA made changes to its concussion treatment protocols, this time passing legislation that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

74. Under that new policy, schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions."

75. The policy further states that students diagnosed with a concussion "shall not return to activity for the remainder of that day" and the team physician would determine that medical clearance.

76. Finally, the policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses, including signs and symptoms of concussion" to medical staff and noted that students would be provided educational materials on concussions during the signing process.

77. However, this policy too is flawed: due to the very nature of concussions, student-athletes suffering concussive injuries are in no position to police themselves or to give informed consent about whether to continue playing. As the NCAA, Big Ten, and Penn State have long known, the types of questions used to screen players for concussions include "What's your

name?", "What year is it?", and "What sport are we playing?". These types of questions are used for screening precisely because players experiencing concussions routinely fail to answer them correctly. A player who cannot state his or her own name is in no condition to make an informed decision about whether or not to continue playing, and is entirely dependent on others, such as NCAA, Big Ten, or Penn State, to identify concussive injuries in real-time and take appropriate remedial actions. For an injured student, Defendants stand in the role of a guardian tasked with making decisions in the student's best interest. For decades, Defendants have failed to fulfill that role and have instead acted in their own best interest, all to the life long detriment of thousands of 18 to 22 year olds.

78.     In the end, these (still deficient) policies were implemented far too late for Plaintiffs and the Class, who suffered reasonably foreseeable harm as a result of the NCAA's, Big Ten's, and Penn State's actions.

## FACTS SPECIFIC TO PLAINTIFF SAMUELS

79.     Plaintiff Samuels played football from 1988–1991 at Penn State as a defensive back. Unfortunately, Samuels sat out of the game in 1990 due to football-related injuries and, after resuming play in 1991, was subsequently forced to withdraw from his final year of college.

80.     Prior to playing for Penn State, Samuels had an illustrious high school career at Farrell High School in Farrell, Pennsylvania. In addition to being named to the USA Today, Parade Magazine and Scholastic Coach All-America football squads, Samuels captured the PIAA District AA Track Championships in 100, 200 and 400-meter dashes as a junior.

81.     Between 1988 and 1991, Plaintiff Samuels was subjected to repeated head impacts and TBI in practices and games, and suffered numerous concussions each year as a result.

19

82. However, at all times since the inception of Penn State's football program, through at least 2010, there were no concussion management protocols or policies of any kind in place at Penn State to address and treat concussions sustained by student-athletes during practice and in games.

83. In fact, although Plaintiff Samuels sustained repetitive concussive and sub-concussive hits in practices and games for the profit and promotion of Penn State and the NCAA and Big Ten, Defendants failed to adopt or implement any concussion management safety protocols or return to play guidelines whatsoever during his time on Penn State's football team.

84. Accordingly, every time Plaintiff Samuels suffered a concussive or sub-concussive hit, he immediately returned to the field of play.

85. Likewise, each time Plaintiff Samuels suffered a concussive or sub-concussive hit, he was deprived by Defendants of the appropriate medical attention and treatment that they knew was necessary to monitor, manage, and mitigate risks associated with TBI.

86. During that time, Plaintiff Samuels was subjected to repeated head impacts and TBI in practices and games, and suffered several concussions as a result.

87. As a result, Plaintiff Samuels now suffers from deficits in cognitive functioning, reduced processing speed, decline in attention and reasoning, loss of memory, sleeplessness, and mood swings, among other issues.

**FACTS SPECIFIC TO PLAINTIFF RAVOTTI**

88. Plaintiff Ravotti played football for Penn State between 1990 and 1994 as a linebacker and defensive end.

89. Between 1990 and 1994, Plaintiff Ravotti was subjected to repeated head impacts and TBI in practices and games, and suffered numerous concussions each year as a result.

90.     However, at all times since the inception of Penn State's football program, through at least 2010, there were no concussion management protocols or policies of any kind in place at Penn State to address and treat concussions sustained by student-athletes during practice and in games.

91.     In fact, although Plaintiff Ravotti sustained repetitive concussive and sub-concussive hits in practices and games for the profit and promotion of Penn State and the NCAA and Big Ten, Defendants failed to adopt or implement any concussion management safety protocols or return to play guidelines whatsoever during his time on Penn State's football team.

92.     Accordingly, every time Plaintiff Ravotti suffered a concussive or sub-concussive hit, he immediately returned to the field of play.

93.     Likewise, each time Plaintiff suffered a concussive or sub-concussive hit, he was deprived by Defendants of the appropriate medical attention and treatment that they knew was necessary to monitor, manage, and mitigate risks associated with TBI.

94.     During that time, Plaintiff Ravotti was subjected to repeated head impacts and TBI in practices and games, and suffered several concussions as a result.

95.     As a result, Plaintiff Ravotti now suffers from deficits in cognitive functioning, reduced processing speed, decline in attention and reasoning, loss of memory, sleeplessness, and mood swings, among other issues.

## CLASS ACTION ALLEGATIONS

96.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure Rule 23(b)(3) on behalf of themselves and a Class defined as follows:

> **Class**: All individuals who participated in Pennsylvania State University's varsity football program between 1952 and 2010.

Plaintiff Ravotti additionally brings this action pursuant to Federal Rule of Civil

Procedure Rule 23(b)(3) on behalf of himself and Subclass defined as follows:

> **Big Ten Subclass**: All individuals who participated in Pennsylvania State University's varsity football program between 1990 and 2010.

The following people are excluded from the Class and Big Ten Subclass (collectively, referred to as the "Class", unless otherwise indicated): (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

97. **Numerosity**: The exact number of the members of the Class is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and belief, hundreds of Penn State football players fall into the definition of the Class. Members of the Class can be identified through Defendants' records.

98. **Commonality**: There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members. Common questions for the Class include, but are not limited to the following:

> (a)    Whether Defendants had a duty to adequately warn and educate players about the dangers and symptoms of concussions and concussion-related brain injuries;

> (b)    Whether Defendants had a duty to enact rules and procedures to protect players from sustaining concussions and concussion-related traumatic brain injuries;

(c)     Whether Defendants' conduct as alleged herein constitutes and breach of duty;

(d)     Whether Defendants' conduct as alleged herein constitutes negligence;

(e)     Whether Defendants' conduct as alleged herein constitutes breach of contract;

(f)     Whether Defendants' conduct as alleged herein constitutes fraudulent concealment;

(g)     Whether Defendants' were unjustly enriched at the expense of Plaintiffs and the Class; and

(h)     Whether Plaintiffs and the Class are entitled to equitable relief, including actual and compensatory damages, and other injunctive relief.

99.     **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Class, as Plaintiffs and other members sustained damages arising out of the wrongful conduct of Defendants based upon the same negligent conduct.

100.     **Adequate Representation**: Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs.

101.     **Predominance and Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. The damages suffered by the individual members of the Class are relatively small in comparison to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for the members of the Class to obtain effective relief from Defendants' misconduct on an individual

basis. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## FIRST CAUSE OF ACTION
## NEGLIGENCE
### (Individually and on Behalf of the Class as Against All Defendants)

102. Plaintiffs incorporate by reference the foregoing allegations.

103. From its inception and by virtue of its role as the governing body in college athletics, the NCAA has historically assumed a duty to protect the health and safety of all student-athletes at member institutions. NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to football players. Defendant Big Ten shared this same duty to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to football players.

104. Defendant Penn State also assumed similar duties to its football players, including Plaintiffs.

105. The duties of all Defendants included an obligation to supervise, regulate, and monitor the rules of the Penn State football program and provide appropriate and up-to-date

guidance and regulations to minimize the risk of long-term and short-term brain damage to Penn State football players.

106.    Defendants NCAA and Big Ten had an additional duty to educate Penn State and Penn State football players on the proper ways to evaluate and treat TBI during football games and practices, including repetitive sub-concussive and concussive injury. The NCAA's and Big Ten duty further included a duty to warn student athletes of the dangers of sub-concussive and concussive injuries and of the risks associated with football before, during, and after they played college football and as additional information came to light.

107.    All Defendants had a duty not to conceal material information from Penn State football players, including Plaintiffs.

108.    Defendants breached their duties to Plaintiffs by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of TBIs on the playing field, in locker rooms, and in the weeks and months after Penn State football players sustained TBIs, as well as providing treatment for the latent effects of TBI. These failings include, but is not limited to:

(a)    failing to recognize and monitor concussive and sub-concussive injury during football practices and games;

(b)    failing to inform the student football players of the dangers of concussive and sub-concussive injuries;

(c)    failing to implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or is suspected of sustaining such injuries;

(d)    failing to implement procedures to monitor the health of football players who have sustained (or are suspected of sustaining) concussive and/or sub-concussive injuries;

(e)    failing to inform the football players' extended families of

25

concussive and/or sub-concussive injuries the student football players had sustained; and

(f)     failing to provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time Plaintiffs left Penn State.

109.    Defendants breached their duties to Plaintiffs by fraudulently concealing and/or failing to disclose and/or failing to recognize and/or being willfully blind to: (a) material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to student football players.

110.    Penn State, in particular, breached its duty to Plaintiffs by actively teaching and encouraging Penn State football players to inflict head injuries on themselves and others as an effective way to play football.

111.    Plaintiffs relied upon the guidance, expertise, and instruction of Defendants in understanding risks associated with the serious and life-altering medical issue of concussive and sub-concussive risk in football.

112.    At all times, Defendants had superior knowledge of material information regarding the effect of repeated traumatic head injuries. Because such information was not readily available to Plaintiffs, Defendants knew or should have known that Plaintiffs would act and rely upon the guidance, expertise, and instruction of Defendants on this crucial medical issue, while at Penn State and thereafter.

113.    Repetitive TBIs during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes

26

deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as protein, which is a signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

114. Plaintiffs experienced repetitive sub-concussive and concussive brain impacts during his college football career that significantly increased his risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

115. The repetitive head accelerations and hits to which Plaintiffs were exposed presented risks of latent and long-term debilitating chronic illnesses. Absent Defendants' negligence and concealment, the risks of harm to Plaintiffs would have been materially lower, and Plaintiffs would not have sustained the brain damage from which they currently suffer.

116. The repetitive head impacts and TBIs Plaintiffs sustained while playing football at Penn State resulted in neuro-cognitive and neuro-behavioral changes in Plaintiffs, including neuro-cognitive disability, decline, and forgetfulness, all of which will require future medical care.

117. As a direct and proximate result of Defendants' negligence, Plaintiffs have incurred damages in the form of permanent brain damage, emotional distress, past and future medical costs, health care, home care expenses, other out of pocket expenses, lost time, lost future earnings, and other damages. Plaintiffs will likely incur future damages caused by Defendants' negligence.

118. As a result of their misconduct, Defendants are liable to Plaintiffs for the full measure of damages allowed under applicable law. Plaintiffs, individually and on behalf of the

Class, seek actual damages for Defendants' negligence, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**SECOND CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT**
**(Individually and on Behalf of the Class as Against All Defendants)**

119.    Plaintiffs incorporate by reference the foregoing allegations.

120.    Defendants knew that repetitive head impacts in football games and full-contact practices created a risk of harm to student-athletes that was similar or identical to the risk boxers' faced when receiving repetitive impacts to the head during boxing practices and matches, and professional football players, many of whom were forced to retire from professional football because of head injuries.

121.    Defendants were aware of and understood the significance of the published medical literature described in the preceding paragraphs of this Complaint, which detailed the serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which Penn State football players were exposed.

122.    Defendants were willfully blind to and/or knowingly concealed from Plaintiffs and the Class the risks of TBI in NCAA football games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

123.    Through concealment of material facts, Defendants intended to induce a false belief, under circumstances creating a duty to speak. Defendants intended to induce a false belief that Plaintiffs and the Class should continue to play football and should not be prevented from playing football after a concussion or several concussions that should have required time to heal.

124.    Plaintiffs and the Class could not have reasonably been expected to know or

discover the truth about the risks associated with sub-concussive or concussive injuries, or were prevented or mislead from obtaining such truthful information. Plaintiffs and the Class were under the care and treatment of Defendants and justifiably relied on their silence as representing facts that did not exist.

125.     Given Defendants' superior and unique vantage point, Plaintiffs reasonably looked to Defendants for guidance on head injuries and concussions, including the later-in-life consequences of the repetitive head impacts they sustained while a football player at Penn State.

126.     The concealed information was such that Plaintiffs and the Class would have acted differently if they had been aware of the material facts known to, and concealed by, Defendants. Had Plaintiffs and members of the Class known the full facts in Defendants' possession, they would: not have continued to play after an injury; or would have taken additional time to allow their brain injuries to heal before returning to play; or would have taken additional precautions while playing football; or would not have continued to play college football at all. Despite Defendants' knowledge, they failed to act reasonably by developing appropriate guidelines or rules regarding return to play criteria and other safety procedures. The Defendants' inaction and concealment increased the risk of long-term injury and illness in their student-athletes.

127.     As a direct and proximate result of Defendants' knowing concealment and/or willful blindness, Plaintiffs have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and  non-economic damages that are ongoing and continuing in nature.

128.     As a result of their misconduct, Defendants are liable to Plaintiffs for the full measure of damages allowed under applicable law. Plaintiffs, individually and on behalf of the

Class, seek actual damages for Defendants' fraudulent concealment, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS CONTRACT
### (Individually and on Behalf of the Class as Against Defendant NCAA)

129.    Plaintiffs incorporate by reference the foregoing allegations.

130.    As a football player at Penn State, an institution governed by the NCAA, Plaintiffs were required to, and did, enter into a contract with the NCAA as a prerequisite to sports participation. The contract required Plaintiffs to complete a form affirming that they had read the NCAA regulations and applicable NCAA Division manual, which expressly encompassed the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, and further, that they agreed to abide by NCAA Division bylaws.

131.    In exchange for Plaintiffs' agreement, the NCAA promised to perform certain services and functions, including, inter alia:

  (a)  conducting intercollegiate athletics "in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes," NCAA Const., Art. 2, § 2.2;

  (b)  requiring that "each member institution [] protect the health of, and provide a safe environment for, each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3; and

  (c)  requiring that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience." NCAA Const., Art. 2, § 2.2.

132.    By signing and agreeing to abide by NCAA regulations, and thereafter participating in NCAA sanctioned sports programs in accordance with such regulations, Plaintiffs and the Class fulfilled their contractual obligations to the NCAA.

133.    As described in the foregoing allegations, the NCAA breached the Parties'

agreement by failing to ensure that its student-athletes were provided with a safe environment in which to participate in their NCAA sport activities. The NCAA further breached the contract by concealing and/or failing to properly educate and warn players about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

134.    Plaintiffs entered into a written agreement with NCAA in which they committed to play football at Penn State, to attend Penn State as students, and to comply with all codes of conduct and obligations as both football players and students at Penn State.

135.    That contract required that Penn State fulfill its obligations to Plaintiffs, and those obligations included that:

> (a) Penn State conduct the Penn State football a manner designed to protect and enhance the physical and educational well-being of Plaintiffs and other student football players; and

> (b) require that the Penn State football program furnish a safe environment for Plaintiffs and all of the program's participants.

136.    Plaintiffs fulfilled their obligations under the contract.

137.    Defendants' contractual breaches with Plaintiffs and the Class caused Plaintiffs and the Class to suffer physical injury and damages in the form of past, ongoing, and future medical expenses.

138.    As a result of its misconduct, Defendant NCAA is liable to Plaintiffs for the full measure of damages allowed under applicable law. Plaintiffs, individually and on behalf of the Class, seeks actual damages for NCAA's contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(Individually and on Behalf of the Class as Against all Defendants)**

139.    Plaintiffs incorporate by reference the foregoing allegations.

140.    To the extent that an express written contract cannot be established among Plaintiffs, the Class, and Defendants, the facts set forth above support the finding of an implied contract.

141.    Under the implied contract, student-athletes agreed to be bound by NCAA rules and regulations in exchange for their participation in NCAA controlled athletic programs, including the Penn State football program. As a condition of the implied contract, the NCAA agreed to abide by, and Penn State agreed to implement, the promises set forth in its own Constitution and Bylaws, as described above.

142.    Likewise, after 1990, under the implied contract, student-athletes agreed to be bound by NCAA and Big Ten rules and regulations in exchange for their participation in NCAA and Big Ten controlled athletic programs, including the Penn State football program. As a condition of the implied contract, the NCAA agreed to abide by, and Penn State and Big Ten agreed to implement, the promises set forth in its own Constitution and Bylaws, as described above.

143.    Plaintiffs and the Class indicated their acceptance of their respective contracts contract, and further, fully performed under the contract, by participating in the Penn State football program in accordance with NCAA and Big Ten rules and regulations, respectively.

144.    Defendants breached their implied contractual duties by failing to ensure that student-athletes were provided with a safe environment in which to participate in football activities. Defendants further breached their contracts by concealing and/or failing to properly educate and warn players about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

145.    Defendants' breach caused Plaintiffs and the Class to suffer physical injury and

damages in the form of past, ongoing, and future medical expenses, other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiffs and the Class will likely incur future damages caused by Defendants' breaches.

146. As a result of their misconduct, Defendants are liable to Plaintiffs for the full measure of damages allowed under applicable law. Plaintiffs, individually and on behalf of the Class, seeks actual damages for Defendants' contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**FIFTH CAUSE OF ACTION**
**BREACH OF EXPRESS CONTRACT**
**(Individually and on Behalf of the Class as Third-Party Beneficiaries as Against**
**Defendants NCAA and Penn State)**

147. Plaintiffs incorporate by reference the foregoing allegations.

148. To the extent that no express or implied contract is found to exist between Plaintiffs and Defendants, an express contract existed between the NCAA and Penn State. Under the terms of that contract, Penn State agreed to abide by the applicable NCAA rules and regulations, including those expressly set forth in the NCAA's Division Manuals, Constitution, and Bylaws.

149. Under the terms of that contract, as set forth in the NCAA Constitution and encompassed within the NCAA Division Manuals, Penn State and NCAA agreed to, among other things: (1) "conduct[] [intercollegiate athletic programs] in a manner designed to protect and enhance the physical and educational well-being of student athletes"; and (2) "protect the health of and provide a safe environment for each of its participating student-athletes."

150. Plaintiffs and the Class are the intended third-party beneficiaries of the contract between the NCAA and Penn State. Such an intention can be found in the express language of the NCAA's rules and regulations, as well as the stated purpose and principles of the NCAA

organization.

151.     Penn State and NCAA breached the contractual duties owed to Plaintiffs and the Class under that contract by: (1) failing to implement or require rules of play and return to play criteria to minimize or prevent the risk of concussions and concussion-related injuries; and (2) failing to adequately inform and educate Penn State football players on the symptoms and long-term dangers of concussions and concussion-related injuries.

152.     As a direct result of Penn State and NCAA's breach, Plaintiffs and the Class suffered physical injury and damages in the form of past, ongoing, and future medical expenses, and other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiffs and the Class will likely incur future damages caused by Penn State and NCAA's conduct.

153.     As a result of their misconduct, Defendants NCAA and Penn State are liable to Plaintiffs for the full measure of damages allowed under applicable law. Plaintiffs, individually and on behalf of the Class, seeks actual damages for NCAA's and Penn State's contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**SIXTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(*In the Alternative to Breach of Contract*)**
**(Individually and on Behalf of the Class as Against All Defendants)**

154.     Plaintiffs incorporate by reference the foregoing allegations, excluding paragraphs 129-153.

155.     Defendants receive significant revenues from the collegiate football played by student-athletes. These revenues include, but are not limited to, contractual revenues from broadcasting, merchandising agreements, and ticket sales.

156.   Defendants appreciate and have knowledge of such benefits.

157.   Under principles of equity and good conscience, Defendants should not be permitted to retain the profits they receive at the expense of Plaintiffs and the Class while refusing to pay for medical expenses incurred as a result of their unlawful actions or otherwise failing to prevent such injuries.

158.   Plaintiffs, individually and on behalf of the Class, seek restitution and/or disgorgement of all monies Defendants have unjustly received as a result of their conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Robert Samuels and Eric Ravotti individually and on behalf of the Class, request that the Court enter an Order providing for the following relief:

A.   Certify this case as a class action on behalf of the Class defined above, appoint Plaintiffs as Class Representatives, and appoint their counsel as Class Counsel;

B.   Declare that Defendants' actions, as set out above, constitute negligence, fraudulent concealment, breach of contract, and unjust enrichment;

C.   Award all economic, monetary, actual, consequential, compensatory, and punitive damages caused by Defendants' conduct, including without limitation damages for past, present, and future medical expenses, other out of pocket expenses, lost time and interest, lost future earnings, and other damages. Further, Plaintiffs and the Class will likely incur future damages caused by Defendants' misconduct;

D.   Award Plaintiffs and the Class their reasonable litigation expenses and attorneys' fees;

E.   Award Plaintiffs and the Class pre- and post-judgment interest, to the extent

allowable;

      F.     Enter injunctive and/or declaratory relief as is necessary to protect the interests of

Plaintiffs and the Class; and

      G.    Award such other and further relief as equity and justice may require.

**JURY DEMAND**

Plaintiffs demand a trial by jury for all issues so triable.

                    Respectfully submitted,

                    **ROBERT SAMUELS** and **ERIC RAVOTTI**,
individually and on behalf of all others similarly
situated,

Dated: May 17, 2016           By: /s/ Benjamin H. Richman
                        One of Plaintiffs' Attorneys

                    Jay Edelson
                    jedelson@edelson.com
                    Benjamin H. Richman
                    brichman@edelson.com
                    Benjamin S. Thomassen
                    bthomassen@edelson.com
                    EDELSON PC
                    350 North LaSalle Street, 13th Floor
                    Chicago, Illinois 60654
                    Tel: 312.589.6370
                    Fax: 312.589.6378

                    Rafey S. Balabanian
                    rbalabanian@edelson.com
                    EDELSON PC
                    329 Bryant Street
                    San Francisco, California 94107
                    Tel: 415.234.5342
                    Fax: 415.373.9495

                    Jeff Raizner
                    jraizner@raiznerlaw.com
                    RAIZNER SLANIA LLP
                    2402 Dunlavy Street
                    Houston, Texas 77006

Tel: 844.456.4823
Fax: 713.554.9098

John Driscoll*
john@thedriscollfirm.com
THE DRISCOLL FIRM, P.C.
211 North Broadway, 40th Floor
St. Louis, Missouri 63102
Tel: 314.932.3232

*Pro hac vice admission to be sought.